| .DUFRESNE, Judge.
This is an appeal by State Farm Mutual Automobile Insurance Co. and its insured, Darlene Russo, from a $140,000 judgment in favor of Michael Rome for injuries suffered by him in an automobile accident. For the following reasons we reduce the general damage award from $125,000 to $50,000. The judgment is otherwise affirmed.
It was stipulated that Jessica Dronet, the driver of one of the vehicles involved this collision, was an insured under the applicable insurance policies. Those policies were a $50,000 liability policy written by State Farm Mutual Automobile Insurance Company, and a $20,000 UM policy written by Massachusetts Bay Insurance Company. Because it was further stipulated that Dronet was 100% at fault, the facts of that accident were not developed in detail at trial. It appears that Rome was driving a van on a suburban divided boulevard when Dronet ran a stop sign and collided with the side of his vehicle. The impact caused the van to jump the median before coming to a stop in the oncoming lane. Rome was able to drive the 12van out of further harm’s way, however. He testified that he was bounced all around, hit his head on the roof, hit his knee on the ignition, and hit the door. This accident was on September 22, 1994.
Plaintiff said he returned to his job as an air conditioning technician for about an hour after the accident and then left to see his family physician, Dr. John Hardges. This doctor’s original diagnosis was thoracic and lumbar back strains. Plaintiff re *461 turned to work on September 27, 1994, and by October 7, had missed 5 days of work due to the accident and doctor’s appointments. He worked steadily until October 24, 1994, when he was in another accident. This time he was run off the road by a hit- and-run driver and went into a ditch. On impact, his abdomen apparently hit the steering wheel and caused a tear in his spleen, and he was rendered unconscious for several hours before help arrived. He was successfully treated conservatively for this spleen condition at Charity Hospital for four days, but ultimately missed about a month of work.
He returned to his job in late November and worked steadily until August 1, 1995, when he again hurt his back while lifting some equipment or a tool bag. He did not return to work for four weeks after this incident and he was terminated from this job on August 29. He testified that he had changed employers at about this time, but continued to do the same type of work. Finally, he was in a third automobile accident on February 19, 1996, which he described as a little bump from the rear. He nonetheless brought suit against the other driver alleging unspecified bodily injuries. He reported a flare-up of his thoracic back problems to one of his doctors following this incident.
A trial, plaintiff testified that he had lost a total of a month to a month |3and one-half of work because of injuries suffered in the original accident of September 22, 1994. His main complaint was pain and a burning sensation in his back between his shoulder blades which flared up on exertion. He said that he could no longer play golf or lift weights, but did cut the grass in his yard. He did not meet and marry his present wife until after the first accident, but said that because of the injury their . sex life had been limited to one or two times per week. He also said that he had one child prior to this marriage and has had two more with his present wife. He testified if he picks up his youngest child for any length of time he experiences burning in his back. He also said that he comes home from work and just lies on the sofa until bedtime because of the back problem.
The medical testimony was contradictory as to whether he had ruptured or otherwise injured a thoracic spinal disc in the accident, but doctors’ opinions were unanimous that no surgery was needed. The particulars of his medical treatments are as follows. On the day of the accident, plaintiff saw Dr. John Hardges, his family doctor. This doctor noted that on this visit plaintiff complained of pain in his jaw, left knee and calf, as well as back pain. This latter pain was mostly in the lower back, but there was also some burning between the shoulder blades and this area was tender. The original diagnosis was lumbar and thoracic back sprain. On September 26, 1994, plaintiff returned and reported that he had no complaints of pain, felt “A-okay,” and wanted to return to full duty at work. Although plaintiff asserted at trial that he had not recovered by then, but had to go back to work to pay his bills, he also stated that he did not remember if he had told this doctor that he was “A-okay.”
His next visit to this doctor was on November 18, 1994, some four |4weeks after the second accident of October 22. He reported at this time some pain in his ribs and stomach area, and the lower back. The examination revealed lumbosacral tenderness. No mention appears of any thoracic back complaints or findings. On this visit plaintiff also wanted approval to return to work from this second accident, which the doctor provided. On December 3, 1994, he again returned and reported that he was 80% improved, was doing his job well, and only had a little lower back pain at night after work. Again, no mention is made of any thoracic back problems.
Plaintiff testified that prior to the second accident his employer had suggested that he see Dr. Robert Mímeles, an orthopedist. This doctor saw him first on Octo *462 ber 7, 1994, and eventually saw him three more times by May of 1995. He testified that he could never find any objective explanation of plaintiffs complaints of thoracic back pain. On the first visit plaintiff complained of pain in the back going intermittently down the right leg, and pain in the neck. On physical examination there were no objective findings, and no disc or nerve root problems were discerned. Reflexes and straight-leg raising tests were normal. The doctor’s notes did not reflect that plaintiff had made any complaints of thoracic back pain. His diagnosis was soft-tissue strain or sprain in the lower back and neck. During a second visit of December 27,1994, plaintiff mentioned the second accident of October 24, and this time complained of an “exacerbation” of his prior lower and mid-back pain. The physical examination was normal and there were no objective findings which would have substantiated plaintiffs subjective complaints.
At this point doctor Mímeles ordered an MRI, which was done on | January 9, 1995. Plaintiff returned on March 14,1995, again complaining of exacerbation of his lower back pain radiating into his right leg, with good and bad days. The doctor’s notes do not reflect any complaints of thoracic back pain on this visit either. The physical exam showed a mild positive straight-leg raising test, indicative of some lumbar involvement, but not of any thoracic problem. Plaintiff returned on May 17, 1995, this time complaining mainly of thoracic back pain mainly in the line of the back, with good and bad days. The MRI of January 9 had been read by the radiologist as “disc prolapse, possibly small extrusion T8-T9.” Doctor Mímeles said that he reviewed the film and was unable to discern any problem at the T8-T9 level or anywhere else in the thoracic spine. His ultimate diagnosis was that this was a soft tissue injury and that he could find no objective evidence of any structural problem from an orthopedic standpoint. He also said that he had subsequently seen the reports of two later MRI’s performed on plaintiff, and both of those were also normal for the thoracic spine. In his opinion, the two later negative MRIs confirmed his reading of the first one as also negative.
On July 24, 1995, plaintiff was referred by his attorney to Dr. John Olson, a neurologist. Plaintiffs primary complaint at this time was lumbar back pain, but he did mention his thoracic back as well. The physical exam showed sensory loss in the lower back and some ankle-jerk problems, but these findings related to the L4-5 and L5-S1 disc. There were no objective findings relating to the thoracic spine. He next saw plaintiff on August 7, 1995, when he was still complaining of back pain. By this visit the doctor had seen the January 9, 1995, MRI, and said that he agreed with the radiologist that there was a problem at the T8-9 level and that his review of | fithe film led him to diagnose a herniated disc. He noted, however, that plaintiffs complaints of burning along the mid-back line were not those which would be expected from such an injury. Rather, the pain from a ruptured T8-9 disc would manifest itself around the chest wall.
At that point, Dr. Olson referred plaintiff to Dr. John Jackson, a neurosurgeon, for a consultation. Dr. Jackson first saw him on August 24, 1995, and found no neurological abnormalities. His opinion of the January 9 MRI was that it showed a small bulging disc at T8-9, but no nerve root or spinal cord compression. Dr. Olson continued to treat plaintiff conservatively and several months later referred him to Dr. Toussaint LeClercq, professor of neurosurgery at the LSU Medical Center. This doctor saw him on March 11, 1996, and his neurological examination was normal. Dr. LeClercq felt that he could do his regular work, and recommended a psychiatric evaluation.
Plaintiff continued to see Dr. Olson, but returned to Dr. Jackson on July 1, 1997, for an updated evaluation. Dr. Jackson ordered a second MRI which was done on *463 October 2, 1997. He said that the bulge in the disc had disappeared and thought this was due to it drying out and flattening. He said that while the disc was not healthy, it should not cause any severe pain, although it might cause some mild pain. Yet a third MRI was ordered by Dr. Jackson and done on January 7, 1999. Again this film was basically normal, except that the doctor thought he saw some mild scoliosis, a condition involving a curving of the spine. He ruled out any possibility that this condition was related to the accident, but said that it might retard resolution of the pain plaintiff said he experiencing.
Dr. Olson continued to see plaintiff on roughly a monthly basis until |7May 19, 1998, after which he only saw him once again on the May 1, 1999, the day before trial. He also testified that the last time he had given plaintiff a prescription for pain medication was at the May 19, 1998, visit. There was no evidence to show that plaintiff had seen any other doctors for his back during that year or had otherwise acquired prescription drugs for pain.
The only doctor who examined plaintiff at the request of the defendants was Dr. Robert Applebaum, a neurosurgeon. He found no evidence of any significant mechanical or neurological injury. He found no need for any further diagnostic treatment.
On the question of causation, there was some dispute as to whether plaintiffs subsequent three accidents were as likely the cause of his symptoms as the first accident. Dr. Hardges noted complaints of thoracic back pain on the visit immediately after the first accident, but reports plaintiff to have been substantially pain free and wanting to return to work about a week later. Dr. Mímeles said that his notes did not reflect any thoracic back complaints on plaintiffs first visit, but showed an “exacerbation” of such pains after the second accident involving his spleen. He did say, however, that assuming that plaintiff had injured his thoracic back in the first accident, he could find no explanation for his continuing complaints.
Dr. Olson first thought plaintiff had a lumbar back problem. When he saw the first MRI, however, his opinion was that there was a ruptured disc at T8-9, even though none of plaintiffs complaints corresponded to this type of injury. Although he did not see him until after the spleen injury, his review of the hospital records of treatment after that incident did not show any thoracic back problems. He therefore assumed that the first accident |swas the cause of the thoracic pains.
Dr. Jackson agreed that if plaintiff was pain free before the first accident and had pain afterwards, then that accident must have been the cause. Dr. LeClercq also could offer no explanation for plaintiffs continuing complaints, even assuming an injury in the first accident.
As for plaintiffs diagnosis, prognosis and limitations, Dr. Olson was of the opinion that he indeed had a ruptured disc at the T8-9 level. He admitted that the only objective evidence of this condition was the January 9, 1995, MRI, and also admitted that the pains reported by plaintiff were not those which would be expected from this condition. When asked about the two subsequent normal MRIs he acknowledged that he had not seen these films, but was of the opinion that disc material does not heal. He stated categorically that because the first one was positive, the second and third could not be normal. He was adamant that if the second and third were indeed normal, than the first one had to have been incorrectly read. He said that sometimes a bony formation would develop at the site of an injured disc and although this was not likely to occur here, plaintiff should nonetheless have three or four additional MRIs about 18 months apart to rule this out. He further indicated that he should see a general practitioner on an as needed basis if the pain flared up, but saw no need for treatment by a specialist and no need for surgery. He said that he *464 should avoid heavy lifting, but saw no real problem with him continuing on his job so long as his fellow workers helped him out with heavy tasks. He saw no reason that he could not do household chores such as cutting grass and washing the car.
Dr. Jackson agreed with Dr. Olson’s recommendations for future |9treatment and also saw no need for surgery. He said he should avoid straining his back and should not do heavy lifting or repetitive bending. Dr. LeClercq thought he could return to full duty and perhaps should see a psychiatrist.
On the basis of the above evidence, the trial judge awarded plaintiff $125,000 in general damages, $5002.90 in past medicals, $10,350 in future medicals, and $1,548 in lost wages. State Farm now appeals this judgment urging primarily that the award for general damages was excessive. It appears that after trial plaintiff settled with Massachusetts Bay, and that party is not before us.
The standard of review of a damage award is whether the judge or jury abused their much discretion in fixing the award. In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), the court reiterated the longstanding rule that an appellate court is not to decide what it considers an appropriate award, but rather to review the exercise of discretion by the trier of fact. It stated further that it is only when the appellate court determines, for articulable reasons and considering the particular injuries to the particular plaintiff in his particular circumstances, that the judge or jury have abused their much discretion that it may set aside an award as either too high or too low.
For the following reasons, we determine that such an abuse of discretion has occurred in this case. While there was a great deal of conflicting evidence regarding the cause of plaintiffs injuries, there is no question that a finding that plaintiff injured his thoracic back in the first accident is reasonable considering the entire record of the case. As to the severity of that injury, the record shows that plaintiff was never treated other than conservatively for this problem and during the year prior to trial | 10was not treated at all. He has undergone no invasive tests nor has he ever been hospitalized for testing. While he was prescribed pain medication for several years, no such prescriptions were given to him for the year preceding the trial. Dr. Olson recommended a few more MRIs to make sure that there was no bone formation around the disc, and as of trial two such tests were interpreted as normal, thus indicating that no further complications were developing. Dr. Olson also thought plaintiff would only need to see a doctor on an as needed basis whenever his condition flared up and then for pain medication, and perhaps do some physical therapy. This doctor also said that surgery would not be needed and all other doctors agreed with this assessment.
As to the effect of the injury on plaintiff, he testified that in the almost five years between the accident and the trial he missed between four and six weeks of work due to the immediate aftermath of the accident and subsequent doctors’ visits. He said that he could no longer play golf or lift weights, could not lift his children, often came home from work in pain, and spent his weekends recuperating from the week’s work. He said that he and his wife had sexual relations about once a week, but did not say if this was any different from his prior sexual life before he met his present wife. He said he took vicodin for pain, but had not done so for the year prior to trial. Considering the nature of plaintiffs injury and non-invasive treatment, the prognosis for the future which Dr. Olson deemed would consist only of conservative treatment on an occasional basis, and the effect it has had on his life and work, we conclude that the general damage award of $125,000 is excessive.
Having determined that the award made by the trial judge was ^excessive, we may now consider awards made in other cases *465 for guidance as to what might be an appropriate award here. After reviewing a number of similar cases, and keeping in mind that each case is unique, we determine that a general damage award of $50,-000 is the highest award reasonably within the discretion afforded the trier of fact, and we therefore reduce the award to that amount. See Lee v. Alsobrooks, 98-49 (La.App. 5th Cir. 5/27/98), 712 So.2d 1060; Whited v. Home Depot USA, Inc., 27,938 (La. 2nd Cir. 8/3/96), 712 So.2d 97; Hurts v. Woodis, 95-2166 (La.App. 1st Cir. 6/28/96), 676 So.2d 1166; Olivier v. Allstate Insurance Co., 95-306 (La. App 3rd Cir. 10/4/95), 663 So.2d 207. We have also reviewed the awards for past and future medicals and past lost wages and find those amply supported in the record.
State Farm raises an issue concerning the wording of the judgment which casts it and Massachusetts Bay for damages in solido, but without specifying the limits of liability for each. It is clear that under the stipulated insurance policies at issue State Farm is liable as primary liability insurer up to the limits of its policy, and Massachusetts Bay is then liable under its UM policy for amounts above State Farm to the limits of its policy, and we so rule. Because these two policies are sufficient to satisfy the amended judgment, we need not address other issues raised by State Farm concerning its insured.
For the above reasons, the general damage award is reduced to $50,000, but the awards for past and future medicals and lost wages are affirmed.

AMENDED, AND AS AMENDED \, AFFIRMED.